UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC,

    Plaintiff,

v.                                                                 Case No. 8:09-cv-386-T-17MAP

THE OHIO WILLOW WOOD
COMPANY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Alps South, LLC ("Alps") is the exclusive licensee of the U.S. Patent No. 7,344,568 ("the '568 patent"), naming John Y. Chen ("Chen") as inventor of "tear resistant gels, composites, and liner articles." It claims Ohio Willow Wood ("OWW"), a competitor in the business of manufacturing and selling prosthetic liners for customers who have prosthetic limbs, infringed the '568 patent. Because both sides dispute the meaning of the claim term "composite article" found in the '568 patent, the parties each move for construction of this term (docs. 34 and 36).[1] *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1995). Having the benefit of a *Markman* hearing, the parties' supporting briefs, and a joint claims construction chart, this report recommends appropriate claims construction for the disputed term applying the principles outlined in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722 (2002); *Markman, supra*; and *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). Accordingly, I find that the term "*composite article*" as used in claims of the '568 patent encompasses "the combination of two or

---

[1] The district judge referred the motions for claim construction to me for a report and recommendation (doc. 53). *See* 28 U.S.C. § 636 and Local Rule 6.01.

more distinct materials to form a new material with enhanced properties."

### A. Claims Construction Standard

Patent infringement actions are composed of two phases. First, in the claim construction phase, the court determines the scope and meaning of the patent claims as a matter of law, and second, the claims are compared to the allegedly infringing device. *See Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*) citing *Markman*, 517 U.S. at 371-73. This report and recommendation addresses only the claim construction phase. Claim construction is a question of law for the Court. *Markman, supra,* 517 U.S. at 372. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips, supra,* 415 F.3d at 1312.

Claim construction "begins and ends in all cases with the actual words of the claim." Absent a special definition spelled out in the specification or prosecution history by the patent applicant, the claim terms are given their "ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa per Azioni,* 158 F.3d 1243, 1248 (Fed. Cir. 1998). In determining the "ordinary meaning," the focus is an objective test of how a person of ordinary skill in the art would understand the claim terms at the time of the invention. The task of construing the claim terms is not always a difficult one. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and the claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Acumed LLC v. Stryker Corp.,* 483 F.3d 800 805 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1314). Once the court has determined the ordinary meaning of the disputed claim terms, it must also consider the specification, and the prosecution history, if it is in evidence, to determine whether the patentee

provided a distinct definition for a term, or used any terms in a manner inconsistent with their ordinary meaning. For instance, the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, and in such a case, the patentee's lexicography governs. *Phillips, supra,* at 1316. When interpreting technical terms, a court looks to the "words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Amgen Inc., supra,* 457 F.3d at 1301 (quoting *Phillips,* 415 F.3d at 1313). *See Renishaw, supra,* 158 F.3d at 1248 ("The intrinsic evidence, and, in some cases, the extrinsic evidence, can shed light on the meaning of the terms recited in a claim, either by confirming the ordinary meaning of the claim terms or by providing special meaning for claim terms.").[2]

---

[2] In *Renishaw*, the Federal Circuit discussed claim term interpretation:
   Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning. *See York Prods, Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning."); *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1577 (Fed. Cir. 1993). Thus, when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims. *See Modine Mfg*, 75 F.3d at 1551. Nor may we, in the broader situation, add a narrowing modifier before an otherwise general term that stands unmodified in a claim. *See, e.g. Bell Communications*, 55 F.3d at 621-22 (faulting the district court for interpreting claim term "associating" to cover only explicit, and not implicit, association); *Specialty Composites*, 845 F.2d at 986-87 (refusing to limit the recited claim term "plasticizer" to external plasticizers where skilled artisans used the term broadly). For example, if an apparatus claim recites a general structure (e.g., a noun) without limiting that structure to a specific subset of structures (e.g., with an adjective), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure. *See, e.g., Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865-66 (Fed.Cir. 1997) (claim term "reciprocating" is given its ordinary meaning and not limited to

While the specification is often the "single best guide to the meaning of a disputed term," claims are not to be interpreted by adding limitations appearing only in the specification." *Phillips, supra,* at 1315 citing *Vitrionics, supra,* 90 F.3d at 1582; *Electro Medical Systems, S.A., supra,* citing *Intervet Am. v. Kee-Vet Lab*, 887 F.2d 1050, 1053 (Fed. Cir.1989). The asserted claims can be assigned a narrower scope only if there is some indication in the patent or the prosecution history that the term was meant to have a more restrictive meaning as used in the patent, or a broader meaning was disclaimed during prosecution. *Id.* at 1313. The Federal Circuit has "consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is meant by a word in a claim 'is not to be confused with adding extraneous limitation appearing in the specification, which is improper.'" *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998) quoting *Intervet Am.,* 887 F.2d at 1053. Hence, the Federal Circuit has recognized that "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Interactive Gift Exp., Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1332 (Fed. Cir. 2001) quoting *Comark Comm., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998). In locating this "fine line" it is useful to remember that we look "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention," and not merely to limit the claim term." *Id.* quoting *Comark* at 1187. In other words, although one may look to the written description to define a

---

mere linear reciprocation); *Sjolund v. Musland*, 847 F.2d 1573, 1581-82 (Fed. Cir. 1988) (refusing to limit claim term "baffle" to only rigid baffles and term "panel" to only panels of lattice construction).
*Renishaw, supra*, 158 F.3d at 1249-50.

disputed term already in a claim limitation, "the resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property." *RF Delaware, Inc. v. Pacific Keystone Technologies, Inc.*, 326 F.3d 1255, 1264 (Fed. Cir. 2003) quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Most of the time, an analysis of the intrinsic evidence will resolve any ambiguity in a disputed term; however, the court may consider extrinsic evidence "if necessary to aid the court's understanding of the patent." *Wright Medical Technology, Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1443 (Fed. Cir. 1997). Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. Extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims, and may not be used to vary or contradict the claim language. *Vitronics,* at 1584-85.

B. Disputed claims term– "composite article"

The parties dispute the meaning of the term "*composite article*" as used in every asserted claim of the '568 patent (claims 1, 2, 4, 9, 10 and 11). The pertinent claim language is:

> gel liner comprising a *composite article* of a gelatinous elastomer composition, G, in contact with one or more of a substrate material, M, ... wherein said *composite* formed from the combination . . . [of] a sequential addition or a permutation of one or more of said $G_n$ with or without one or more $M_n$ ; wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, ceramics, synthetic resin, synthetic fibers or refractory materials; and wherein when n is a subscript of G, n denotes the same or a different gel rigidity. . . .

Alps advances that "*composite article*" should be defined as "a gel liner comprised of one or more gelatinous elastomer compositions, G, physically interlocked with one or more substrate materials,

5

M, including permutations of said same or different G with said same or different M." In short, Alps argues that the specification teaches that the nature of the contact between the gelatinous elastomer composition(s) and the substrate material(s) of the gel liner is that they are *physically interlocked*. Hence, Alps seeks to use the limiting terms from the patent's abstract and specifications to narrow the claim term. Alps points to the specification at column 10, line 13-column 11, line 17 in support of its interpretation, and states this portion of the specification sets out the nature of the contact between the gelatinous elastomer composition(s) and substrate material(s), clarifying the contact as "physically interlocking":

> This physical elastomeric network structure is reversible, and heating the polymer above the softening point of the glassy domains temporarily disrupt the structure, which can be restored by lowering the temperature. During mixing and heating in the presence of compatible plasticizers, the glassy domains (A) unlock due to both heating and solvation and the molecules are free to move when shear is applied. The disruption and ordering of the glassy domains can be viewed as a unlocking and locking of the elastomeric network structure. At equilibrium, the domain structure or morphology as a function of the (A) and (Z) or (A) and (Y) phases (mesophases) can take the form of spheres, cylinders, lamellae, or bicontinous structures. The scale of separation of the phases are typically of the order of hundreds of angstroms, depending upon the molecular weights (i.e. Radii of gyration) of the minority-component segments. The sub-micron glassy domains which provides the physical interlocking are too small to see with the human eye, too small to see using the highest power optical microscope and only adequately enough to see using the electron microscope. At such small domain scales, when the gel is in the molten state while heated and brought into contact to be formed with any substrate and allowed to cool, the glassy domains of the gel become interlocked with the surface of the substrate. At sufficiently high enough temperatures, with or without the aid of other glassy resins (such as polystyrene homopolymers and the like), the glassy domains of the copolymers forming the gels fusses and interlocks with even a visibly smooth substrate surface such as glass. The disruption of the sub-micron domains due to heating above the softening point forces the glassy domains to open up, unlocking the network structure and flow. Upon cooling below the softing point, the glassy polymers reforms together into sub-micron domains, locking into a network structure once again, resisting flow. It is this unlocking and locking of the network structure on the sub-micron scale with the surfaces of various materials which allows the gel to form interlocking s with other materials.

> A useful analogy is to consider the melting and freezing of a water saturated substrate, for example, foam, cloth, fabric, paper, fibers, plastic, concrete, and the like. When the water is frozen, the ice is to a great extent interlocked with the substrate and upon heating the water is able to flow. Furthermore, the interlocking of the ice with the various substrates on close examination involves interconnecting ice in, around, and about the substrates thereby interlocking the ice with the substrates. A further analogy, but still useful is a plant or weed well established in soil, the fine roots of the plant spreads out and interconnects and forms a physical interlocking of the soil with the plant roots which in many instances is not possible to pull out the plant or weed from the ground without removing the surrounding soil also.
>
> Likewise, because the glassy domains are typically about 200 Angstroms in diameter, the physical interlocking involve domains small enough to fit into and lock with the smallest surface irregularities, as well as, flow into and flow through the smallest size openings of a porous substrate. Once the gel comes into contacts with the surface irregularities or penetrates the substrate and solidifies, it becomes difficult or impossible to separate it from the substrate because of the physical interlocking. When puling the gel off a substrate, most often the physically interlocked gel remains on the substrate. Even a surface which may appear perfectly smooth to the eye, it is often not the case. Examination by microscopy, especially electron microscopy, will show serious irregularities. Such irregularities can be the source of physical interlocking with the gel.
>
> Such interlocking with many different materials produce gels having many uses including forming useful composites. The gel compositions is demoted as "G" can be physically interlocked or formed in contact with a selected material denoted as "M" for simplicity . . .

OWW opposes Alps's narrow construction. It maintains that the term "*composite article*" should be interpreted more broadly, proposing this term be construed to mean "an article formed from one or more gelatinous elastomer compositions in contact with one or more substrate materials." Frankly, I find neither party's proposed resolution of the claim dispute satisfying, particularly when measured against the controlling *Markman* construction calculus.[3]

---

[3] In approaching the task of claims construction here, I am reminded of the debate in Lewis Carroll's *Through the Looking Glass*:
  "When *I* use a word,: Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean– neither more nor less."

While Alps points to columns 10-11 to support its position that "composite article" necessarily means that the gelatinous elastomer composition(s) and the substrate material(s) of the gel liner are *physically interlocked*, other parts of the specification encompass different manners of affixing the gelatinous composition(s) to the substrate material(s).  For example, the specification teaches that the invention gels can be formed into gel strands, gel bands, gel tapes, gel sheets, and other articles of manufacture in combination with or without substrates or materials such as natural or synthetic fibers, multifibers, fabrics, films, and the like (column 15, lines 54-58); that the molten gelatinous elastomer composition will adhere sufficiently to certain plastics provided the temperature of the molten gelatinous elastomer composition is sufficiently high to fuse or nearly fuse with the plastic (column 17, line 25-31); that certain commercial resins which can aid in adhesion to materials can be added in minor amounts to the gelatinous elastomer composition (column 17, lines 34-41); that incorporation of such adhesion resins is to provide strong and dimensional stable adherent invention gels, gel s and gel articles that typically can be characterized as adhesive gels, soft adhesives, or adhesive sealants (column 17, lines 57-61); that strong and tear resistant adherent invention gels may be formed with various combinations of substrates or adhere (attach, cling, fasten hold, stick) to substrates to form adherent invention gel/ substrate articles and s (column 17, lines 61-64); and that various substrate and adherent invention gel combinations can be utilized to form adherent invention gel articles. (column 17, lines 65-67).  Moreover, the specification at column 18, lines 30-59 states:

---

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master– that's all."

*Through the Looking-Glass and What Alice Found There,* ch. 6 (1872).

> The adherent invention gel compositions of the invention can be casted unto various substrates, such as foam, plastic, fabric, metal, concrete, wood, wire screen, refractory material, glass, synthetic resin, synthetic fibers, and the like, or the adherent invention gels formed and then can be adhere [sic] (attach, cling, fasten, hold, stick) to the desired substrates to form various G$n$M$n$, G$n$G$n$, G$n$M$n$G$n$, M$n$G$n$M$n$,M$n$G$n$G$n$, G$n$G$n$M$n$, G$n$G$n$M$n$ [sic], G$n$M$n$M$n$G$n$, M$n$G$n$G$n$M$n$, M$n$M$n$G$n$G$n$, M$n$M$n$M$n$G$n$G$n$, G$n$M$n$G$n$G$n$, G$n$M$n$G$n$M$n$M$n$, M$n$G$n$M$n$G$n$, M$n$G$n$M$n$, or any permutations of said combinations s for uses requiring temporary peel and re-use as well as permanent long-life use as needed. Adhesion to substrates is most desirable when it is necessary to apply the adherent invention gels to substrates in the absence of heat or on to a low temperature melting point substrate for later peel off after use, such as for sound damping of a adherent invention gel applied to a first surface and later removed for use on a second surface. The low melting substrate materials which can not be exposed to the high heat of the molten adherent invention gels, such as low melting metals, low melting plastics (polyethylene, PVC, PRE, PVA, and the like) can only be formed by applying the adherent invention gels to the temperature sensitive substrates. Other low melting plastics include: polyolefins such as polyethylene, polyethylene copolymers, ethylene alpha-olefin resin, ultra low density ethylene-octene-I copolymers, copolymers of ethylene and hexene, polypropylene, and etc. Other cold applied adherent invention gels to teflon type polymers: TFE, PTFE, PEA, FEP, etc., polysiloxane as substrates are achieved using the adherent invention gels of the invention.

The specification further provides at column 18, line 60- column 19, line 5:

> Likewise, adherent invention gel substrate s can be both formed by casting hot onto a substrate and then after cooling adhering the opposite side of the adherent invention gel to a substrate having a low melting point. The adherent invention gel is most essential when it is not possible to introduce heat in an heat sensitive or explosive environment or in outer space. The use of solid or liquid resins promotes adherent invention gel adhesion to various substrates both while the adherent invention is applied hot or at room temperature or below or even under water. The adherent invention gels can be applied without heating to paper, foam, plastic, fabric, metal, concrete, wood, wire screen, refractory material, glass, synthetic resin, synthetic fibers, and the like.

In describing the "selected amount of crystallinity in the midblock" sufficient to achieve improvements in the patented gels' physical properties, the specification states that "improvements

9

in one or more physical properties including improved damage tolerance, improved crack propagation resistance, improved tar resistance, improved resistance to fatigue of the bulk gel and resistance to catastrophic fatigue failure" would be found "such as between the surfaces of the invention gel and substrate or at interfaces of the interlocking material(s) and invention gel" (column 25, line 61- column 26, line 3).  By this statement, and viewing the specification as a whole, the patent contemplates that the substrate material is not necessarily physically interlocked with the invention gel, and plainly recognizes that the gel could instead be otherwise affixed to the surface of the substrate.

In addition, the specification provides that "The invention gels can be casted molded, pressured molded, injection molded and various methods of forming gel articles and with or eithout [sic] interlocking with various substrates, such as open cell materials, metals, ceramics, glasses, and plastics, elastomers, fluropolymers, expanded fluropolymers, Teflon (TFE, PTFE, PEA, FEP, etc.), expanded Teflon, spongy expanded nylon, etc.; the molten invention gel is deformed as it is being cooled" (column 39, line 66- column 40, line 6).  The specification provides at column 44, lines 33-46 :

> As taught in my application Ser. No. 08/288,690 filed Aug. 11, 1994, now U.S. Pat. No. 5,633,286 and specifically incorporated herein, generally the molten gelatinous elastomer composition will adhere sufficiently to certain plastics (e.g. acrylic, ethylene copolymers, nylon, polybutylene, polycarbonate, polystyrene, polyester, polyethylene, and the like) provided the temperature of the molten elastomer composition is sufficient [sic] high to fuse or nearly fuse with the plastic. In order to obtain sufficient adhesion to glass, ceramics, or certain metals, sufficient temperature is also required (e.g. above 250º F.).  Commercial resins which can aid in adhesion to materials (plastics, glass, and metals) may be added in minor amounts to the gelatinous elastomer composition, these resins include ...

In describing the advantages and versatility of the invention gels, the specification states that a

wheelchair cushion can be made and states: "The composition can be formed into any desired shaped, size and thickness suitable as a cushion, the shaped composition can be additionally surrounded with film, fabric, foam, or any other desired material or combinations thereof. Moreover, the composition can be casted onto such materials, provided such materials substantially maintain their integrity (shape, appearance, texture, etc.) during the casting process" (column 49, lines 44-51).

Even more references in the specification show that the inventor contemplated that the articles formed from the invention gels did not necessarily involve physically interlocking of the gel to the substrate material. For instance, the specification at column 11, lines 32-36 describes that "sandwiches of invention gel-material (i.e. invention gel-material- invention gel or material-invention gel-material, etc.) are useful as dental floss, shock absorbers, acoustical isolators, vibration dampers, vibration isolators, and wrappers." Moreover, the claims describe a "a gelatinous elastomer composition G in contact with one or more of a selected substrate material M", and are not explicitly limited to gels interlocked with substrates. The title of the patent itself "Tear Resistent Gels, Composites, and Liner Articles" is broad, encompassing adhesion resins that allow the gel to adhere to plastics, glass and metals rather than interlock with them (*see* specification at columns 17-18). In sum, while the specification at columns 10-11 quoted above refers to "interlocking" and describes how locking and interlocking of the gel and s material can occur, other parts of the specification discussed above as well as figures 2a-d, 3a-3n, and 4a-4w describe other embodiments as well.

As the Federal Circuit has recognized, and as the Court noted during the *Markman* hearing, litigants proffer claim interpretations arguably consistent with their claims, the specification, and the prosecution history that attempt to produce victory for their side. *See Exxon Chemical Patents, Inc. v. Lubrizol Corporation*, 64 F.3d 1553, 1556 (Fed. Cir. 1995). However, it is not the task of this

Court to decide which side is correct. Instead, this Court must "independently assess the claims, the specification, and if necessary the prosecution history, and relevant extrinsic evidence, and declare the meaning of the claims." *Id.* Given that *Markman* rulings serve as the basis of the jury instructions should the case go to trial, it is critical to set forth an express construction of the material claim terms in dispute. *See AFG Industries, Inc. v. Cardinal IG Co., Inc.,* 239 F.3d 1239, 1247 (Fed. Cir. 2001). In performing my independent obligation to construe the term "*composite article*," I find neither party's proposed construction entirely satisfactory.

As previously noted, where the patentee does not set forth an explicit definition of a disputed term, the first step in construing the term is giving the words their ordinary and customary meaning. *Phillips, supra,* 415 F.3d at 1312. At the *Markman* hearing, the parties, via their respective expert witnesses, offered dictionary definitions of the disputed term. The American Heritage Dictionary defines "composite" as "a composite structure or entity" or "a complex material, such as wood or fiber glass, in which two or more distinct, structurally complimentary substances, esp. metals, ceramics, glasses, and polymers, combine to produce structural or functional properties not present in any individual component." And, the *Introduction to Composite Materials Design* by Ever J. Barbero, a text which both sides agree is authoritative, provides that "a composite material is formed by the combination of two or more distinct materials to form a new material with enhanced properties." Indeed, the three testifying experts, all skilled in the relevant art, agreed with these definitions.[4] This is not a case where the patentee, acting as his own lexicographer, limited the term

---

[4] Dr. Atwood, ALP's expert witness, testified that the dictionary definitions are consistent with how one of ordinary skill in the art would understand the term "composite" to be used in a technical sense in the industry (see *Markman* hearing transcript, pp. 46-47). Dr. Atwood testified that "physically interlocked" means the same as "formed in contact with" Specifically, Dr. Atwood testified that "The physically interlocked is what happens upon forming

or specially defined the term as used in this patent, the position essentially advanced by Alps. For example, neither the specification nor the prosecution history narrows or limits the term "composite article" from that meaning assigned by one skilled in the art.

Accordingly, I find that this is a case where the ordinary meaning of the claim language as understood by a person of skill in the art is readily determinable and claim construction involves no more than applying the widely accepted meaning of a commonly understood phrase. *See Acumed, supra,* 483 F.3d at 805. This conclusion is buttressed by the parties' positions at the *Markman* hearing. When I distill their arguments to their core, their focus is more on the breadth of the phrase, "in contact with," than the meaning of the term, "composite material." Properly focused, the parties' views are muddled. They offer redundant terminology and offer new undefined terms. For instance, applying Alps's proposed construction to claim 1, one would read the claim as "A gel liner comprising a <u>a gel liner comprised of one or more gelatinous elastomer compositions, G, physically interlocked with one or more substrate materials, M, including permutations of said same or different G with said same or different M</u> of a gelatinous elastomer composition, G, in contact with one or more of a selected substrate material, M, said gelatinous elastomer composition comprising ... ."[5]

---

on contact" (*Markman* hearing transcript, p. 58, lines 7-18). Dr. Laghi, ALPS's other expert witness, testified that "composite" is a combination of two or more different materials that are joined so that the resulting material has properties or functional mechanical characteristics that are not present in the two components" (*Markman* hearing transcript, p. 85, lines 8-11). Dr. Walker, OWW's expert witness, agreed with these dictionary definitions (*Markman* hearing transcript, p. 121, lines 13-20) and defined the term "composite" to mean "a single material that is now made from multiple different materials held together in some way into a single material and that benefits in its properties from the properties of all the components in it." (*Markman* hearing transcript, p.121, line 24-p. 122, line 3).

[5] This Court is aware that reexamination proceedings are currently pending before the United States Patent and Trademark Office regarding the '568 patent. Notably, on April 9, 2010, in the reexamination proceedings, the PTO office rejected claims 1, 2, 4, and 9-11 of the '568

Alternatively, OWW's proposed construction would result in construing claim 1 as "A gel liner comprising a <u>an article formed from one or more gelatinous elastomer compositions in contact with one or more substrate materials</u> of a gelatinous elastomer composition, G, in contact with one or more of a selected substrate material, M, said gelatinous elastomer composition comprising ..."

Instead, after considering the intrinsic evidence, including the prior art incorporated by reference into the '568 patent (specifically the '253 patent), I find that the ordinary and customary meaning of the term as used in the above- cited dictionaries and accepted by the expert persons of ordinary skill in the art to be more appropriate in construing the term as used in the claims of the '568 patent. Accordingly, I construe the term "composite article" and "composite" as used in the '568 patent to mean "the combination of two or more distinct materials to form a new material with enhanced properties."[6]

*C. Conclusion*

For the reasons set forth above, it is hereby

RECOMMENDED:

---

patent, all of the claims at issue in this litigation. The PTO rejected these claims "under 35 U.S.C. § 103(a) as being unpatentable over Arbogast (WO 96/29033) in view of Hammond (WO 93/23472), as evidenced by Septon 4055 MSDS and also rejected the claims "under 35 U.S.C. §103(a) as being unpatentable over Kania II (US 5,830,237 in view of Hammond (WO 93/23472) as evidenced by Septon 4055" *See Ex Parte* Reexamination Communication Transmittal Form*,* doc. 49, pp. 6-14. In response, on June 8, 2010, Chen, the inventor, submitted amended claims, presumably in an effort to alter the claim language in order to escape the PTO's rejection of his claims as unpatentable due to prior art. The amended claims delete the phrase "in contact" and add the term "physically interlocked." *See* Response to *ExParte* Reexamination Action of April 9, 2010, doc. 50-1.

[6] The initial claims construction briefs raised other disputed terms. Since then, the parties agreed to the meaning of those terms leaving "composite article" as the sole remaining claims construction issue. This Court adopts the parties' agreed upon constructions for these terms. *See* Joint Claims Construction Charts, doc. 59.

1. "*Composite article*" as used in claims of the '568 patent encompasses "the combination of two or more distinct materials to form a new material with enhanced properties."

IT IS SO REPORTED in chambers on September 23, 2010.

*/s/ Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

\

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. § 636(b)(1).